IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of<br>CATHERINE MARIE MACLAREN, | ) ) ) | No. 78067-1-I |
| Respondent, | ) ) | |
| and | ) ) | PUBLISHED OPINION |
| TRAVIS CAREY MACLAREN, | ) ) | |
| Appellant. | ) | FILED: May 6, 2019 |

SCHINDLER, J. — The court shall deny a petition to modify a parenting plan unless the court finds adequate cause to hold a hearing. To establish adequate cause, the moving party must submit an affidavit with specific facts that establish new or previously unknown facts that a substantial change has occurred in the circumstances of the child or the nonmoving party and evidence sufficient to establish each fact the moving party must prove to modify the parenting plan. The court must also weigh and consider a number of other factors on a case-by-case basis. We reject the argument that the trial court used an improper legal standard in determining adequate cause. But because we conclude the court abused its discretion in finding the affidavits and evidence presented did not establish adequate cause to schedule a hearing on the petition to modify the parenting plan, we reverse and remand.

FACTS

Catherine and Travis MacLaren are the parents of H.M. and O.M.[1] On May 14, 2012, the court entered a final parenting plan. The parenting plan imposed no restrictions and designated Catherine as the residential parent for four-year-old H.M. and two-year-old O.M. The parenting plan gives Travis residential time with the children the first three weekends of every month. The parents alternate holidays and each have 14 days of vacation with the children each year. The parenting plan states Catherine and Travis shall engage in joint decision-making on major decisions.

On November 6, 2017, Travis filed a petition to modify the parenting plan under RCW 26.09.260(1) and (2)(c). "I ask the court to make a major change in the parenting schedule or to change the person the child lives with most of the time." Travis alleged a substantial change in circumstances and the "current living situation is harmful to [the children's] physical, mental or emotional health. It would be better for the children to change the parenting/custody order." Travis states, "To protect the children, I ask the court to limit the other parent's parenting time and participation" in decision-making. Travis asked the court to appoint a guardian ad litem to "investigate, report, and make recommendations" regarding the best interests of 10-year-old H.M. and 8-year-old O.M.

Travis submitted a declaration and medical and school records in support of the petition to modify the parenting plan, including an April 2017 report prepared by the International Center for Autism and Neurodevelopment (ICAN) that diagnoses H.M. with autism, Seattle Children's Hospital medical records, and a June 17, 2017 "Mental Health Evaluation and Safety Plan."

---

[1] We refer to Catherine and Travis MacLaren by their first names for clarity.

In 2009, two-year-old H.M. was diagnosed with "Developmental Delay (Adaptive Communication-Speech Language)." In 2017, H.M. was diagnosed with "Moderate Severity Autism (a 5 on a scale of 1-10), combined with Childhood-Onset Anxiety Disorder, and ADHD."[2]

Travis attached school records that show he alleged H.M.'s "symptoms have worsened" while in school and "cause him much suffering." The declaration includes the following chronology from school records:

- In 2013 (6 years old): worsening perseveration - now disruptive to class; report card shows "AR" (at risk for failing) in Reading, Language Arts and Math. Referral to ESY[3] (summer school) program.

- In 2014: Eligibility re-testing showed "Clinically Significant" problems in Cognitive abilities (Atypicality, Adaptability, Depression, Anxiety, Withdrawal, Poor Social Skills, and Hyperactivity), as well as ALL areas of his Executive Functioning. Emotional control problems. Poor social skills. Acute expressive language difficulties. Cognitive IQ[4] = 82. . . .

- In 2015: [H.M.] scored in the 1st (lowest) percentile for both Literacy and Math, a full grade level behind his peers. Showed negative self-image and self-talk. Frequent loss of emotional self-control - required teacher intervention. Poor social skills. Regression in both cognitive and communication skills over each summer. . . .

  . . . .

- In 2016 (8 years old): . . . . Remained in 1st percentile for Literacy, 6th percentile in Math. Class behavior distracting and disruptive to other students. Recited movie dialog instead of conversing. Very few or no friends. Began being bullied. Expressed chronic feelings of anxiety, loneliness, isolation, hopelessness, self-hatred.

  . . . .

---

[2] Attention deficit hyperactivity disorder.

[3] Extended school year.

[4] Intelligence quotient.

• In 2017 (9 years old): . . . . [H.M.]'s educational struggles continued, with him performing in lowest percentiles and being continually bullied and ostracized at school. He scored "1", minimal progress toward standard for homework completion, with only 4 out of 61 assignments turned in.

Travis asserts that during the summer break at the end of the 2016 school year, Catherine "refused" to follow the recommendation of the special education teacher to have H.M. "evaluated for neurodevelopment problems." Travis alleged, "Catherine has consistently denied that anything is wrong and refuses to act on any recommendations for treatment."

Travis states that in fall 2016, Catherine "eventually consented" to "get [H.M.] evaluated at Children's Hospital . . . with the stipulation that appointments take place only on my weekends and vacations, to which I agreed in order to try to get [H.M.] the help he needed."

Because of the "year-long wait" to get an evaluation at Children's Hospital, H.M.'s pediatrician Dr. Kevy Wijaya referred him to ICAN for an evaluation. ICAN diagnosed H.M. with "Autism Spectrum Disorder (Moderate) Without Accompanying Intellectual Impairment" but "With Accompanying Social-Pragmatic Language Impairment," "Moderate" ADHD "Impacting Academic Performance & Learning," and "Anxiety Disorder" with "Features of Performance & Social Anxiety Impact."

The 18-page April 2017 ICAN report recommends coordinating with the school, arranging therapy for H.M. with a "board-certified behavior analyst," and "[e]ffective home strategies" to improve H.M.'s "executive processes for daily activities outside of the classroom."

4

The ICAN report recommends providing the report to the school:

> I strongly recommend providing a copy of this report to the school psychologist . . . so that the eligibility criteria for [H.M.]'s IEP[5] can be updated to autism. His current special education plan outlines his learning goals with regard to academic and psychosocial facilitation and the following recommendations related to instructional strategies can further support his needs as a student:
>> . . . [H.M.] exhibits clear deficits with executive organization that adversely impact his task persistence, instruction maintenance, sequential planning, strategy adaptation, and the accurate organization/application of information. The following supports, accommodations, and instructional strategies are recommended to target these challenges for improvement.

The ICAN report recommends support and intervention strategies at home and at school:

> [H.M.]'s deficits with attentional processes negatively impact his sustained auditory attention, selective-focused attention, divided attention, and impulse control abilities. The following support and intervention strategies have been outlined to remediate his attentional abilities across home and school contexts:
>> . . . Provide a copy of this report to the school psychologist at [H.M.]'s elementary school and inquire about eligibility for accommodations or specialized instructions under the service heading of a student with other health impairment (i.e., dysfunction in sustained attention) needs. The following classroom accommodations and instructional strategies may be helpful for [H.M.] at this time with regard to improving his attentional skills.
>> . . . .

> . . . .

> . . . Tutoring services will also be helpful to aid in [H.M.]'s academic development and can be obtained from the sources below.

The ICAN report recommends H.M. engage in therapy with a board-certified behavior analyst:

> [H.M.] will benefit from a sustained individual ABA[6] program that can target his social skill development in a structured and systematic fashion.

---

[5] Individual education plan.

[6] Applied behavior analysis.

5

ABA programming can also help with his executive organization and his school adherence. This program should be designed and overseen by a board-certified behavior analyst (BCBA) and implemented by trained behavior technicians. ABA programming will strengthen [H.M.]'s social information processing skills and the necessary skills for joining with peers. I have provided a referral to ICAN's ABA service department to initiate this program and his family will be contacted in the near future to facilitate this process. The following providers are also recommended as they relate to where [H.M.] resides.

The ICAN report also recommends additional strategies and information for the parents:

Effective home strategies and resources to improve [H.M.]'s executive processes for daily activities outside of the classroom include but are not limited to the following:
. . . Provide [H.M.] with visual _and_ verbal information whenever possible with regard to task completion expectations.
. . . .

. . . .

. . . I have provided [H.M.]'s family with the contact information of several of ICAN's parent support advocates for further support during this time of transition. These volunteers are parents of children with autism who lend support and consultation from a parents' perspective to those in need. I highly recommend making use of this resource in the future.[7]

In April 2017, Travis provided a copy of the ICAN evaluation to the school and met with H.M.'s "teachers, principal, and school counselors to update his IEP, with his new diagnosis."

Travis asserts Catherine did not agree with the ICAN diagnosis of autism and objected to changing the IEP for H.M.

Despite the recommendation of [H.M.]'s primary care physician, the Autism specialists, and school and special education professionals, Catherine objected to any further action taken on [H.M.]'s behalf. She told the school she did not agree with the diagnosis and became angry at the Special Education staff for incorporating some of its recommendations into [H.M.]'s IEP. In multiple emails, Catherine claimed (and continues to this

---

[7] Emphasis in original.

6

day to claim) that [H.M.] was already receiving enough (and perhaps too many) services.

Travis submitted an e-mail from Dr. Wijaya that recommends Catherine obtain a second opinion. The e-mail states, in pertinent part:

> I think the [ICAN] assessment is as thorough as one could get, and I have no reason to doubt its validity. It is a shame that not everyone can be on the same page in regards to the result of this assessment. Coming up with a diagnosis of ASD[8] and its co-morbidities is not one easy task. All tests are standardized and evidence-based. You are more than welcome to seek a second opinion, but please kindly be reminded that they will administer the very same series of tests, which will most likely lead to very similar findings to the first evaluation.
>
> . . . .
>
> . . . I will excuse myself from being in the middle of this argument, but I hope you can convince his mother to move forward with either yet another testing, or therapies as I mentioned above.

Travis alleged Catherine obtained auditory and speech evaluations from other treatment providers to show H.M. did not have autism.

> As of July 2017, though she is [H.M.]'s primary residential caregiver, Catherine has obtained NONE of the services recommended in his treatment plan and has objected to accommodations in his IEP.
> Instead, she began taking [H.M.] to a variety of new providers for hearing tests, speech evaluations, et cetera, to whom she did not disclose [H.M.]'s diagnosis, with the object of trying to disprove Autism by obtaining diagnoses for Auditory Processing Disorder (APD) and Receptive/ Expressive Language Disorder.

As an example, Travis submitted a copy of a May 11, 2017 "Initial Evaluation" from Island Hospital Physical, Occupational and Speech Therapy.

The Island Hospital evaluation notes that Catherine told the speech-language pathologist H.M. was diagnosed with autism " 'so that he could receive additional

---

[8] Autism spectrum disorder.

services,' " but she "disagrees with the diagnosis":

> [H.M.] is a 9-year-old male with known sensory processing and visual spatial disorder as well as ADHD. He was seen at the Western Washington University Audiology clinic in April 2017, where they determined that he has Central Auditory Processing Disorder. He also has a history of expressive and receptive language disorder. He was seen at the Autism clinic in Issaquah, Washington, where he was tested for Autism. His mother reported that his scores were borderline, but they did give him the diagnosis of Autism, "so that he could receive additional services." However, his mother disagrees with this diagnosis and is getting a second opinion from the University of Washington in Seattle. He is currently on the waiting list for re-testing.

Travis states that on June 16, 2017, H.M. told him he "wanted to kill himself." H.M. said he was being bullied, "terrified about 5th grade," and "hated himself." Travis states, "[H.M.] said he had been feeling suicidal and <u>sharing these thoughts with his mother for the past six months</u>, which Catherine later verified."[9]

The June 17 Seattle Children's Hospital "Psychiatry/Psychology Consultation" states, in pertinent part:

> Father states that this is not the first time patient has wished he wasn't here. Patient told his father that he has tried to kill himself before and father asked how. Patient told his father that he sometimes chokes himself at home and at school and demonstrated to his father how he does it. This was the first time father became aware of patient sometimes choking himself as father and mother are divorced and have no contact with each other. When father and fiance asked patient about any other ways he had thought about killing himself patient told them he could stab himself with a knife that he could find in the kitchen.
>
> Patient shared that yesterday when he shared his suicidal thoughts he had a bad day at school. This made patient think "I shouldn't be here in this world." Patient shared that he is almost always alone at recess and people think he is dumb. Patient feels like he deserves to be made fun of because he is "dumb and stupid." Patient is often name called at school. Patient stated he wanted to kill himself because he doesn't want to be bullied and all alone. Patient shared that he has passive suicidal thoughts everyday but could not quantify when they started. "Sometimes when I am sad I feel like an idiot because a mean person keeps proving they are

---

[9] Emphasis in original.

better than me. I hate myself." Patient shared that when he chokes himself he is trying to end his life. In the ED[10] patient acknowledged he had some passive suicidal thoughts but was able to articulate how to keep himself safe in the community should those thoughts return.

"I don't feel safe near myself I might make a huge mistake."

Mother was reached via phone and shared that patient does make suicidal statements when he is upset. Typically patient will later calm down and deny that he still feels suicidal. Mother shared that he has an auditory processing delay. Mother shared that patient has never expressed a plan or any intent with his suicidal statements.

The Children's Hospital medical records state the diagnosis of H.M. is suicidal ideation, autism spectrum disorder, ADHD, and anxiety disorder. The hospital discharged H.M. with a safety plan and instructions to obtain weekly mental health therapy and "follow up with patient as soon as possible."

> Precipitating factors for today's crisis include patient being bullied at school and Boys and Girls Club. Perpetuating factors for today's crisis includes the lack of consistent outpatient care patient is getting at this time. . . . Although patient had suicidal thoughts yesterday, he is currently denying having active suicidal thoughts with intent to act on them and he and his family were able to make a safety plan. . . . [L]eft message with patient's therapist to increase sessions to once weekly instead of monthly and to follow up with patient as soon as possible.

Travis alleged 8-year-old O.M. has also "been showing signs of significant emotional trouble."

> [O.M.] describes a state of constant conflict at her Mom's house, wherein her mother is always angry and yelling, and [O.M.] is punished far more often than her special needs brothers. Her mother tells her she hates her. She is berated, for instance, that she acts just like her father (me).
> . . . .
> . . . [O.M.]'s older half-brother (Catherine's child by a different relationship) is suicidal, too, and when he threatens to kill himself or run away, [O.M.] says she cries and begs him not to.
> On [O.M.]'s 8th Birthday, [O.M.] said she sometimes wished she had not been born, because her Mom is so mad at her all the time. [O.M.] said her mom said she'd made a "big mistake" having kids, and now, at 8

---

[10] Emergency department.

years old, [O.M.] has decided she never wants to get married or have babies.

Travis alleged Catherine "vents adult-level worries and fears to" O.M. and as a result, O.M. "says she feels like it's her job to 'protect' her mom" and "shows an over-developed sense of responsibility for her mother's well-being." Travis alleged that in September 2017, O.M. said Catherine told O.M. that "she hated her."

Travis states that in January 2017, O.M. "went from enjoying counseling to refusing to go within the space of one week." Travis alleged O.M. has "become resistant to therapy and suffers emotionally for it" because Catherine "discouraged her from sharing her feelings" with "anyone outside" the home.

Travis set forth information from school records and alleged:

- 2014-15: Kindergarten: Report Card = Below grade level in Reading and Writing. Teacher requested that Catherine read with her daily over the summer. Catherine did not.

- 2015-16: First Grade: . . . . [O.M.] enrolled in special education for both Reading and Math. Without support at home doing homework, her final grade: "1 - Minimal Progress Toward Standard."

- 2016-17: Second Grade: . . . . [O.M.] started the year 1 full grade level behind in Reading and Writing. Problems working and playing well with others.

Travis also alleged Catherine engaged in efforts to alienate and undermine the children's relationship with him and with his fiancé.

Catherine filed a declaration in opposition to the motion to schedule a hearing on the petition. Catherine argued there are "no substantial changes in circumstances in the children or myself . . . to warrant a modification of the existing parenting plan." Catherine disputed the allegations but does not dispute that she disagrees with the

autism diagnosis. Catherine submitted declarations from friends, colleagues, and family members attesting to her parenting skills; a letter from H.M.'s former counselor Kelsey Ozment; hearing and speech-language assessments of H.M.; and school records.

In her declaration, Catherine states she has "not seen the level of symptomology that Travis describes" and has "not seen a worsening of behaviors." Catherine states H.M. was diagnosed with "Expressive and Receptive Language Disorder." According to Catherine, the speech and language pathologist said she had no "other concerns with [H.M.], specifically Autism." Catherine asserts she has "actively addressed [H.M.]'s symptoms and followed up with recommendations of professionals."

Catherine presented an evaluation from Western Washington University for "Auditory Processing." The April 2017 evaluation states hearing loss "is not likely a factor in [H.M.]'s struggle with comprehending speech or processing auditory information." The report states, in pertinent part:

> Abnormal and/or borderline results on subtests for the SCAN-C [test for auditory processing disorder] are not exhaustive in defining the presence of an auditory processing disorder, but rather suggest that an auditory processing disorder may be present and help to guide selections of further testing that will help in diagnosis and remediation of an auditory processing disorder.

Western Washington University evaluated H.M. again seven months later. The December 2017 evaluation reiterates hearing loss is "not a factor in [H.M.]'s reported difficulty in processing auditory signals." The evaluation states H.M.'s "ability to perform the associated behavioral tasks as directed . . . suggest no physiological functional deviations as the basis for his reported auditory difficulties."

> Initial basic comprehensive hearing assessment on 4/28/2017 found the peripheral auditory system, from the outer ear to the inner ear, to be

11

functioning normally with hearing sensitivity established well within normal hearing levels in both ears. Initial hearing evaluation also ruled out the likelihood of a retro-cochlear pathology. Significant and permanent hearing loss is therefore not a factor in [H.M.]'s reported difficulty in processing auditory signals.

. . . .

In summary, various behavioral measures suggest the presence of deficits in auditory decoding, auditory short-term memory, temporal processing, as well as binaural integration capabilities. Deficits in these auditory processes may make it difficult for [H.M.] to comprehend auditory stimuli presented in less than ideal listening scenarios, presented by less than ideal speakers, or that which is more complicated and therefore requires more concentrated effort for full comprehension. It is not uncommon for individuals with auditory decoding and tolerance fading memory problems to also have associated reading, writing, receptive language, and expressive language issues, which is demonstrated currently in [H.M.]'s performance in school and outside of school scenarios. APD test results are consistent with speech-language pathologist's diagnosis of expressive and receptive language disorders as well as mother and teacher's observations. However, while the current auditory processing test results support the presence of an auditory processing disorder, the influence of previously diagnosed receptive and expressive language delays must be considered as many behavioral APD tests are heavily reliant on language capabilities.

Catherine submitted an April 2017 "Notice" from the school. Catherine alleged the school reviewed the ICAN report and is "refusing" to "initiate" a "reevaluation" of H.M.'s eligibility in special education services because H.M. already "qualifies" for several services.

The Notice states the school will use the ICAN report to update H.M.'s IEP "based on new information from this outside evaluation."

The IEP team determined that changing [H.M.]'s eligibility category would not change his services at this time. [H.M.] qualifies in the areas of communication, reading comprehension, written language, math, and social emotional and it has been determined by the team that his current needs are being met through his IEP. A new IEP will be written by 05/13/2017 and again will meet [H.M.]'s needs in the areas identified.

12

Accomodations in the new IEP were updated based . . . on new information from this outside evaluation.

Catherine insisted H.M.'s "reports of 'suicidal ideation' " reflect statements his half-brother makes. Catherine asserts that before Travis took H.M. to the emergency room (ER) at Children's Hospital, H.M. never expressed an intent to harm himself.

> [H.M.]'s older brother also has sensory issues. [H.M.] looks up to his brother and unfortunately has mirrored some of his behavior. When my eldest son has become overly stimulated, he has stated that he wants to die. In response, [H.M.] started to mirror those comments when he became over stimulated as well. Though [H.M.]'s reports of 'suicidal ideation' w[ ]ere mirrored statements of his brother, I never took [H.M.]'s expressions lightly. I always addressed the situation with a discussion regarding the gravity of what [H.M.] said, discussed whether [H.M.] had an intension to follow through with his statements and whether or not [H.M.] had a plan or access to carry out statements. Prior to this ER visit, [H.M.] has never expressed any commitment level or plan to harm himself.

Catherine asserts H.M.'s "struggles with bullying and expressed negative statements about himself" were "addressed in counseling."

Licensed mental health counselor Kelsey Ozment began treating H.M. in February 2017. Ozment states that "at the time of the assessment," Catherine described H.M. as having "anxiety" and an " 'unhealthy understanding of boundaries' as well as some difficulties in expressing emotions." Ozment diagnosed H.M. with "Adjustment Disorder, unspecified." "After completing an assessment with [H.M.] and [Catherine] present, and based on the information given to me at the time of assessment, [H.M.] was diagnosed with an Adjustment Disorder, unspecified." During the course of therapy, "[H.M.]'s father expressed his belief that [H.M.] may have Autism and I was given a copy of an evaluation [H.M.] completed." Ozment states, "I expressed several times that I am not treating [H.M.] for Autism, nor do I express to have specific training in this area." Ozment decided "to discontinue therapy" in

13

September 2017 because "I have exhausted my interventions to assist [H.M.] and he also no longer meets the mental health criteria for an Adjustment Disorder":

> [H.M.] no longer meets mental health criteria at this time for an adjustment disorder, unspecified, as his occasional adjustment difficulties that can occur with peers are not outside of the norm of what would be considered normal adjustment. That being said, due to [H.M.]'s current history of an Auditory Processing Disorder (previously diagnosed prior to my treatment), his engagement in talk therapy has also come to a close as this may not be the most engaging and effective way for [H.M.] to connect in Mental Health services at this time.

Ozment recommended H.M. continue to meet with the school counselor each week and provided referrals for mental health therapy, including "Valley Kids Therapy (Auditory Processing support, Occupational Therapy and Autism Prescreening . . .)" and "Autism/ABA Therapy and assessment at Blue Water Behavior Consulting."[11]

Catherine admitted O.M. "has two brother[ ]s that require special attention" but alleged O.M. is not " 'showing signs of significant emotional trouble.' " Catherine asserted that "on multiple occasions," O.M. said she "did not want to talk" to a counselor, and "I did advocate for [O.M.] and let her know that she has the right to decline to speak to the counselor." Catherine insisted, "I do not speak ill of the Children's father in front of them." Catherine states, "I do not know Travis' fiancé nor do I claim to know her intentions or character."

In reply, Travis submitted the declaration of child mental health specialist Paula Casey. Casey is "professionally trained in the field of Autism through Children's Hospital." Casey states Catherine asked her to provide a second opinion of the "very thorough" ICAN autism diagnosis. Casey states the ICAN report meets "all the markers

---

[11] The ICAN report also recommended "a sustained individual ABA program" for H.M. with Blue Water Behavior Consulting.

14

for Autism" and "confirmed" the autism diagnosis. Casey states Catherine's "denial" is causing H.M. to experience "more tension and confusion."

> [Catherine] . . . deni[ed] that [H.M.] has Autism. She stated she wanted a second opinion from me. I explained my qualifications and further explained the model I used as thoroughly as I was able. [H.M.] and his mother were seen a total of four sessions. The Autism diagnosis was confirmed for [Catherine], with a full explanation of the symptoms and markers present to confirm the diagnosis. . . .
>
> [Catherine] continued to argue against the diagnosis, services and treatment recommended for [H.M.]. . . .
>
> . . . . It is very unfortunate that [H.M.]'s mother would not allow any discussion of Autism, nor allow [H.M.] to continue in treatment. Many of the difficulties [H.M.] has been experiencing are a result of his Autism and can be effectively remediated through treatment. When addressing the bullying and suicide ideation, it was clear that [H.M.] needed tools and insight into understanding and adapting to his Autism. However, with [Catherine] in denial about Autism, this interferes with a healthy approach to supporting [H.M.] in developing these skills, and will cause more tension and confusion for [H.M.] in adapting to his limitations in the future.

The court found Travis did not meet his burden to establish adequate cause to hold a hearing on the petition to modify the parenting plan. The court entered an "Order on Adequate Cause" and dismissed the petition to modify the parenting plan. The order states the court found, "There is not adequate cause to hold a full hearing."[12] The trial court denied Travis's motion for reconsideration.

## ANALYSIS

Travis contends the court used an improper legal standard in determining whether Travis met the burden to establish adequate cause under RCW 26.09.260(1) and RCW 26.09.260(2)(c). Travis also contends the court abused its discretion in

---

[12] Emphasis in original.

15

finding he did not establish adequate cause to hold a hearing on the petition to modify the parenting plan.

Adequate Cause Standard

Travis contends the court erred in applying an improper legal standard to determine whether he met his burden to show adequate cause to hold a hearing on the petition to modify the parenting plan.

RCW 26.09.260 and RCW 26.09.270 govern modification of a parenting plan. Statutory interpretation is a question of law that we review de novo. In re Adoption of T.A.W., 186 Wn.2d 828, 840, 383 P.3d 492 (2016). The primary purpose of the inquiry is to determine and give effect to legislative intent. T.A.W., 186 Wn.2d at 840. If the meaning of a statute is plain on its face, we give effect to that meaning and the inquiry ends. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). "The plain meaning of a statute is discernible by examining everything the legislature has said in the statute itself and any related statutes that reveal legislative intent." In re Custody of E.A.T.W., 168 Wn.2d 335, 343, 227 P.3d 1284 (2010).

The legislature enacted RCW 26.09.260 and RCW 26.09.270 based on the Uniform Marriage and Divorce Act. UNIF. MARRIAGE & DIVORCE ACT (1970) § 409 (amended 1971 and 1973), 9A U.L.A. 439 (1998). The Uniform Marriage and Divorce Act establishes a strong presumption in favor of continuity and against modification. Section 409 of the Uniform Marriage and Divorce Act states, in pertinent part:

> (a) No motion to modify a custody decree may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral, or emotional health.

16

(b) . . . [T]he court shall not modify a prior custody decree unless it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of entry of the prior decree, that a change has occurred in the circumstances of the child or his custodian, and that the modification is necessary to serve the best interest of the child. In applying these standards the court shall retain the custodian appointed pursuant to the prior decree unless:

. . . .

(3) the child's present environment endangers seriously his physical, mental, moral, or emotional health, and the harm likely to be caused by a change of environment is outweighed by its advantages to him.

9A U.L.A. at 439.

Consistent with the Uniform Marriage and Divorce Act, the plain and unambiguous language of RCW 26.09.260 establishes a strong presumption against modification and in favor of continuity. RCW 26.09.260(1) states the court "shall not modify a prior custody decree or a parenting plan"

unless it finds, upon the basis of facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child.

RCW 26.09.260(2) states:

In applying these standards, the court shall retain the residential schedule established by the decree or parenting plan unless:
(a) The parents agree to the modification;
(b) The child has been integrated into the family of the petitioner with the consent of the other parent in substantial deviation from the parenting plan;
(c) The child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child; or
(d) The court has found the nonmoving parent in contempt of court at least twice within three years because the parent failed to comply with the residential time provisions in the court-ordered parenting plan, or the

17

parent has been convicted of custodial interference in the first or second degree under RCW 9A.40.060 or 9A.40.070.

RCW 26.09.270 unequivocally states that the court shall deny the motion to modify the parenting plan unless the court finds the affidavits present adequate cause to schedule a hearing. RCW 26.09.270 provides:

> A party seeking a temporary custody order or a temporary parenting plan or modification of a custody decree or parenting plan shall submit together with his or her motion, an affidavit setting forth facts supporting the requested order or modification and shall give notice, together with a copy of his or her affidavit, to other parties to the proceedings, who may file opposing affidavits. The court shall deny the motion unless it finds that adequate cause for hearing the motion is established by the affidavits, in which case it shall set a date for hearing on an order to show cause why the requested order or modification should not be granted.

Case law adopts the strong statutory presumption in favor of custodial continuity and against modification. In re Marriage of Roorda, 25 Wn. App. 849, 851, 611 P.2d 794 (1980) (citing RCW 26.09.260, .270; Anderson v. Anderson, 14 Wn. App. 366, 541 P.2d 996 (1975); 9A U.L.A. § 409, Comm'rs Note at 212 (Master ed. 1979)). "Custodial changes are viewed as highly disruptive to children." In re Marriage of Shryock, 76 Wn. App. 848, 850, 888 P.2d 750 (1995) (citing In re Marriage of McDole, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993). "Another purpose of the statute is to discourage a noncustodial parent from filing a petition to modify custody" because "[l]itigation over custody is inconsistent with the child's welfare." Roorda, 25 Wn. App. at 851-52. The statutory requirement to establish adequate cause "provid[es] stability for the child by imposing a heavy burden on a petitioner which must be satisfied before a hearing is convened." Roorda, 25 Wn. App. at 851. In Roorda, we also note the related policy "of preventing harassment of the custodial parent and providing stability for the child by

18

imposing a heavy burden on a petitioner which must be satisfied before a hearing is convened." Roorda, 25 Wn. App. at 851.

Travis argues that in order to show adequate cause, the moving party need only assert allegations that if proved true, would support the requested modification. Travis claims RCW 26.09.270 requires only a burden of production and not a burden of persuasion. We disagree. Neither the plain and unambiguous language of RCW 26.09.260 or RCW 26.09.270 nor case law supports his argument.

Under RCW 26.09.260(1), the court "shall not modify" a parenting plan "unless it finds, upon the basis of facts that have arisen" since entry of the parenting plan or that were "unknown to the court" at the time, that "a substantial change has occurred in the circumstances of the child or the nonmoving party" and that modification is in the child's best interest.[13] RCW 26.09.270 states the court "shall deny the motion" to schedule a hearing on a petition to modify the parenting plan "unless it finds that adequate cause for hearing the motion is established by the affidavits."[14]

In Roorda, we held that the adequate cause finding "requires something more than prima facie allegations which, if proven, might permit inferences sufficient to establish grounds for a custody change." Roorda, 25 Wn. App. at 852. In In re Parentage of Jannot, 110 Wn. App. 16, 25, 37 P.3d 1265 (2002), affirmed, 149 Wn.2d 123, 65 P.3d 664 (2003), we held, "The court should require something more than unsupported conclusions." "[T]he information considered in deciding whether a hearing is warranted should be something that was not considered in the original parenting plan." Jannot, 110 Wn. App. at 25 (citing Roorda, 25 Wn. App. at 853). "[T]here must

_____

[13] Emphasis added.
[14] Emphasis added.

be some prima facie showing of each element." Jannot, 110 Wn. App. at 24.

"Certainly, documented supported claims of physical, sexual, or emotional abuse warrant a full hearing." Jannot, 110 Wn. App. at 25.

In E.A.T.W., the Washington Supreme Court interpreted the meaning of adequate cause. E.A.T.W., 168 Wn.2d at 344-48. The court states, "RCW 26.09.270 requires that affidavits 'set[ ] forth facts supporting the requested order or modification.' " E.A.T.W., 168 Wn.2d at 347.[15] The court held that "at the very minimum," adequate cause under RCW 26.09.270 means a showing that supports " 'a finding on each fact that the movant must prove in order to modify.' " E.A.T.W., 168 Wn.2d at 347 (quoting In re Marriage of Lemke, 120 Wn. App. 536, 540, 85 P.3d 966 (2004)).

We reject the argument that the burden to establish adequate cause under RCW 26.09.260 and .270 is analogous to a CR 12(b)(6) motion for failure to state a claim upon which relief can be granted or a motion for judgment as a matter of law under CR 50. Under CR 12(b)(6), we review de novo whether beyond a reasonable doubt there are " 'any set of facts which would justify recovery.' " Tenore v. AT&T Wireless Servs., 136 Wn.2d 322, 329-30, 962 P.2d 104 (1998); Kinney v. Cook, 159 Wn.2d 837, 842, 154 P.3d 206 (2007) (quoting Tenore, 136 Wn.2d at 330). Under CR 50(a)(1), the court may grant a motion for judgment as a matter of law if "there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue."

In contrast to CR 12(b)(6) and CR 50(a)(1), the Washington Supreme Court in Jannot expressly adopts an abuse of discretion standard and emphasizes that the

_____

[15] Alteration in original.

child's "weighty interest in finality" distinguishes the statutory adequate cause determination from other cases where a child's living arrangements are not at stake. Jannot, 149 Wn.2d at 126-28. "[W]e recognize that a trial judge does stand in a better position than an appellate judge to decide whether submitted affidavits establish adequate cause for a full hearing on a petition to modify a parenting plan." Jannot, 149 Wn.2d at 126. Parenting plans are "individualized decisions that depend upon a wide variety of factors, including 'culture, family history, the emotional stability of the parents and children, finances, and any of the other factors that could bear upon the best interests of the children.' " Jannot, 149 Wn.2d at 127 (quoting Jannot, 110 Wn. App. at 19-20). The court concluded the relevant factors "and their comparative weight are certain to be different in every case, and no rule of general applicability could be effectively constructed." Jannot, 149 Wn.2d at 127. A trial court must "weigh these varied factors on a case-by-case basis." Jannot, 149 Wn.2d at 127. "Because adequate cause determinations are fact intensive," the court held the trial court must articulate "on the record . . . the reasons for denying a full hearing." Jannot, 149 Wn.2d at 127-29.

We hold the burden of showing adequate cause requires more than allegations that if proved true, would establish a prima facie case supporting modification.

We hold that to overcome the presumption against modification, the moving party must set forth facts and provide supporting evidence—not self-serving or conclusory statements—to establish adequate cause to schedule a hearing on the petition to modify. The trial court considers and weighs the facts alleged by the parties in the affidavits, the evidence, and other factors on a case-by-case basis to determine whether

21

the moving party has established adequate cause to hold a hearing on whether to modify the parenting plan.

Challenge to Adequate Cause Finding

Travis asserts the court abused its discretion in finding he did not establish adequate cause to hold a hearing on the petition to modify the parenting plan. A court abuses its discretion if the decision is manifestly unreasonable or based on untenable grounds because the factual findings are unsupported by the record, based on an incorrect standard, or the facts do not meet the requirements of the correct standard. In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

To show adequate cause, Travis must present facts and evidence to support findings under RCW 26.09.260(1) and (2)(c).

Under RCW 26.09.260(1), Travis must prove:

[F]acts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial change has occurred in the circumstances of the child[ren] or the nonmoving party and that the modification is in the best interest of the child[ren] and is necessary to serve the best interests of the child[ren].

Under RCW 26.09.260(2)(c), Travis must prove the children's "present environment is detrimental to [their] physical, mental, or emotional health."

The court found Travis did not meet the burden of showing adequate cause for a hearing on the petition to modify the parenting plan:

Well, I read your list of horribles, to use your language, but I don't find that the responsive declarations verify that, in fact, those things have occurred. If anything, I find these children are very much enveloped in lots of services and lots of medical professionals and mandatory reporters, and a great deal of, I guess, difference on what's necessary or what the formal diagnosis is, but I don't find any basis from those pleadings to say there aren't two sides to this story . . . .
. . . .

22

... I'm finding that the burden has not been met at this point in time and that there's a direct disagreement, if you will, between the affidavits and declarations on both sides, both by professionals and otherwise.

But what you're really asking me to find is that there is a change in circumstances in the non-moving party's situation or the child's welfare such that the Court finds adequate cause to look into it further. And I have multiple responsive declarations and materials from the responding side saying all of those issues are being addressed and that there is no grave danger, there is no substantial change in circumstances.

. . . .

. . . The autism versus the hearing and neurological diagnosis and all the rest, that doesn't show me that somebody is inadequately caring for the needs of, specifically [H.M.], and both children.

The IEPs are in place. That means there are wrap-around services and special attention being paid to these children at the school level. You have got a separate mental health counselor appointed for [H.M.] because of the self-harm issues. And that reporter — reports or files or report indicating that those issues are gone, no need for further mental health counseling, in that professional's opinion.

So while I read everything in the claims and took them very seriously, as I read the responsive materials I found that there were adequate responses, if you will, to assure me that those issues are being addressed.

The record does not support the trial court's decision. Travis presented specific facts and evidence that would support finding a substantial change in circumstances and a present environment that is detrimental to the physical, mental, or emotional health of the children.

The uncontroverted record establishes that in March 2017, ICAN diagnosed H.M. with autism, and that Catherine disagrees with the diagnosis and refuses to engage in autism treatment for H.M. The uncontroverted record also establishes that in June 2017, Children's Hospital diagnosed H.M. with suicidal ideation.

The record does not support the trial court finding that "the professionals appear to be disagreeing" about the autism diagnosis. The record also does not support the

23

trial court finding that "any learning disabilities or shortcomings are being directly addressed by the school with the IEP and all the people involved."

H.M. was first diagnosed with autism in 2017. The ICAN neuropsychological evaluation diagnosed H.M. with autism spectrum disorder. H.M.'s pediatrician Dr. Wijaya stated the ICAN report is "as thorough as one could get" and that he has "no reason to doubt its validity." Child mental health specialist Paula Casey also confirmed the autism diagnosis. The ICAN report, Dr. Wijaya, and Casey emphasized the critical importance of ensuring that H.M. receive services and support designed to address autism, including counseling. Dr. Wijaya noted the importance of "ensur[in]g that [H.M.] receives . . . appropriate treatment modalities." Casey states, "It is very unfortunate that [H.M.]'s mother would not allow any discussion of Autism, nor allow [H.M.] to continue in treatment. Many of the difficulties [H.M.] has been experiencing are a result of his Autism and can be effectively remediated through treatment."

Catherine submitted professional evaluations diagnosing H.M. with hearing and speech-language deficits, but these evaluations neither refute nor address the autism diagnosis. Catherine submitted the written Notice from the school district denying Travis' request to re-evaluate H.M.'s IEP eligibility category following the autism diagnosis. But the Notice states the school based the decision not to re-evaluate H.M. on the determination that he was already receiving autism-focused services, and the school agreed to update the IEP for H.M. with the ICAN report recommendations.

In addition to establishing facts that support finding a substantial change in circumstances, Travis also presented facts that would support finding the present environment is detrimental to the "physical, mental, or emotional health" of the children.

24

RCW 26.09.260(2)(c). The uncontroverted record shows untreated autism and that H.M. expressed suicidal ideation. The record shows that Catherine acknowledges H.M. and his older half-brother require "special attention" and the older half-brother also frequently expresses thoughts about committing suicide. Nonetheless, Catherine insists her daughter O.M. does not need any emotional support or counseling.

We conclude that the trial court abused its discretion in ruling that Travis did not overcome his threshold burden to show adequate cause.

We conclude the trial court did not use an improper legal standard, but the court abused its discretion in finding there is not adequate cause to hold a hearing on the petition to modify the parenting plan. We reverse and remand.[16]

WE CONCUR:

---

[16] We decline to award attorney fees to Catherine under RCW 26.09.140 or RAP 18.9(a).

25