IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DAVID PARSONS,<br><br>               Respondent,<br><br>      v.<br><br>TANYA GOODMAN,<br><br>               Appellant. | No. 87309-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Tanya Goodman appeals from an order of the trial court denying her motion for adequate cause regarding her petition to modify nonresidential aspects of a parenting plan for A.P., her child with David Parsons. She contends the trial court erred when it determined there was not adequate cause for a full hearing on her modification request. She also argues that a portion of the trial court's order operates as a prior restraint infringing on her First Amendment rights. We affirm and deny Parsons's request for attorney fees on appeal.

FACTS

This action is the most recent in a series of appeals concerning the parenting plan for A.P.[1] Here, Goodman challenges the order denying her motion for adequate cause that dismissed her petition to modify a parenting plan. Goodman filed the petition to modify a parenting plan pursuant to RCW 26.09.260(10).

---

[1] The most recent appeal before this court sets out the history of litigation between the parties. See In re Parenting and Support of A.P., No. 80839-7-I (Wash. Ct. App. Nov. 23, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/808397.pdf.

1

In 2016, when A.P. was two years old, the trial court adopted a final parenting plan for A.P. In re Parenting and Support of A.P., No. 80839-7-I, slip op. at 1 (Wash. Ct. App. Nov. 23, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/808397.pdf. Subsequently, "A.P.'s diagnosis of autism spectrum disorder shortly after the trial and issues related to the appropriate treatment following that diagnosis and other health care issues became major sources of conflict." Id. at 3. "Two parenting coordinators worked intensively with the parties," and the parties submitted approximately 20 issues to arbitration. Id.

The first parenting coordinator, who withdrew from the case after working with the parties for approximately a year, described the ongoing conflict in her final status report:

> Joint decision making is unworkable for this family, fuels conflict and results in delays that are not in [A.P.'s] best interests. In most cases, it would be fairly easy to reallocate decision to one or the other parent. In this case, assigning a sole decision maker is complicated by the parents' radically different perceptions of [A.P.] and their polarization regarding his developmental and medical needs.

Id. at 3-4.

I. Father's October 2019 Petition to Modify Parenting Plan

Parsons filed a petition to modify the parenting plan in October 2019. Id. at 4. A court-appointed clinical and forensic psychologist recommended allocating sole decision-making authority to Parsons based on a 104-page parenting evaluation. Id. After a six-day trial with more than 150 exhibits and 12 witnesses, the trial court issued an order and findings on the petition to modify and entered a final parenting plan. Id. Pertinent to this appeal, the court's findings included the following:

> The court found a substantial change of circumstances and that nonresidential changes to the parenting plan were in the child's best interest. See RCW 26.09.260(10). The court determined that the mother had engaged in the abusive use of conflict. The court found that the father's request for sole decision-making authority was reasonable on that basis and in view of the history of each parent's participation in decision making. The plan provides for the father to have sole decision-making authority as to educational and non-emergency health care issues, with input from the mother.

Id. at 4-5. Additionally, the court separately ordered for A.P. to be reevaluated for autism within six months from the time the parenting plan was entered.

On appeal, we affirmed the trial court's order and findings on the modification petition and the final parenting plan. Id. at 1.

## II. Mother's 2024 Motion for Adequate Cause

On June 24, 2024, Goodman filed a petition to modify the parenting plan, and the corresponding motion for adequate cause, to adjust decision-making and transportation arrangements. She contended the court should restore decision-making to her, as a substantial change in circumstances warranted the adjustment. Specifically, she argued that A.P.'s escalating mental health challenges, academic struggles, and unmet medical needs constituted a substantial change in circumstances to proceed to a full modification hearing.[2]

At the hearing for adequate cause, a commissioner of the trial court denied Goodman's motion. Specifically, the court stated it recognized A.P. had special educational needs and behavioral issues, but concluded,

---

[2] In support, Goodman submitted a declaration, and various medical and school records to modify the parenting plan, including a December 2019 report prepared by the International Center for Autism and Neurodevelopment (ICAN) that diagnosed A.P. with autism. This evaluation was pursuant to the previous court order detailed in the final parenting plan.

> [T]here was insufficient evidence that either—what is happening now is different enough—substantially different enough from where things were in—at the time of the last trial and parenting plan entered . . .

> Additionally, there is not sufficient evidence to show that the father is somehow neglecting the child's medical and/or educational needs, which is sort of a long way of saying that I cannot find that there is adequate cause here.

The court emphasized that it considers motions on the merits, "[a]nd that is what [it] did here." The court also noted, "especially when the current parenting plan includes a finding of abusive use of conflict, I don't think the Court can really disregard the history of the case and the–again, the astonishing amount of litigation." Additionally, the court stated that it couldn't "ignore that the trial court here did make a finding of abusive use of conflict," and "at least some of the issues that were before that court and that lead to that finding appeared to be ongoing, which is a concern." Ultimately, the court denied Goodman's motion, finding there was not a substantial change in circumstances, nor would it be "in the best interest to change the parenting plan." Specifically, the court "did not find that changing the decision-making provision would reduce conflict or would be in the best interest of the child."

The court subsequently entered an order denying Goodman's motion for adequate cause, incorporating its oral ruling by reference.

Goodman filed a motion for reconsideration, attaching a report from an "expert regarding domestic violence (DV), child abuse, child custody, and related issues." The court found that the report was "unsworn" and "the basis for [the] opinion was unclear." Additionally, the court questioned why Goodman could not or did not produce the report earlier, or why she did not wait to schedule the adequate cause hearing until the report was ready. Accordingly, the court denied the motion. Goodman timely appealed.

4

DISCUSSION

Goodman argues the trial court erred by concluding she did not establish adequate cause to proceed to a full hearing on her petition to modify the parenting plan. Additionally, she contends that the court imposed an unconstitutional prior restraint that infringes on her First Amendment rights when it put her "on notice" that modification would be increasingly difficult to pursue. Separately, Parsons requests attorney fees on appeal due to Goodman's alleged intransigence.

I. Ruling on Adequate Cause

Goodman argues the trial court abused its discretion by finding there was not adequate cause to modify the 2019 parenting plan. She also argues that the trial court applied "an erroneously heightened legal standard" by considering the 2019 trial court's finding (.191 finding) that she engaged in abusive use of conflict under former RCW 26.09.191(3)(e) (2019).

The statutory procedures for establishing adequate cause and requesting the modification of a parenting plan are set out in chapter 26.09 RCW. There is a "strong statutory presumption in favor of custodial continuity and against modification." In re Marriage of MacLaren, 8 Wn. App. 2d 751, 771, 440 P.3d 1055 (2019). A court generally may not modify a parenting plan unless it finds (1) that there has been a substantial change in the circumstances of the child or the nonmoving party, (2) modification is in the best interests of the child, and (3) modification is necessary to serve the best interest of the child." In re Parentage of M.F., 141 Wn. App. 558, 571,170 P.3d 601 (2007), aff'd, 168 Wn.2d 528, 228 P.3d 1270 (2010) (citing RCW 26.09.260(1)).

Goodman sought modification under RCW 26.09.260(10), which provides that "[t]he court may order adjustments to any of the nonresidential aspects of a parenting plan upon a showing of a substantial change of circumstances of either parent or of a child, and the adjustment is in the best interest of the child." Furthermore, "[a]djustments ordered under [RCW 26.09.260] may be made without consideration of the factors set forth in subsection (2) of [RCW 26.09.260]," which applies to requests to modify residential schedules.[3]

The party seeking modification must submit an affidavit supporting the requested modification, and the nonmoving party may file opposing affidavits. RCW 26.09.270. "The court *shall* deny the motion unless it finds that adequate cause for hearing the motion is established by the affidavits." RCW 26.09.270 (emphasis added). Therefore, the statutory requirement to establish adequate cause imposes a "heavy burden" on a petitioner that must be satisfied before a hearing is convened. MacLaren, 8 Wn. App. 2d at 771 (citing In re Marriage of Roorda, 25 Wn. App. 849, 851, 611 P.2d 794 (1980), overruled on other grounds, In re Parentage of Jannot, 149 Wn.2d 123, 65 P.3d 664

---

[3] Subsection (2) sets out the factors affecting modification of residential schedules:

(2) In applying these standards, the court shall retain the residential schedule established by the decree or parenting plan unless:
(a) The parents agree to the modification;
(b) The child has been integrated into the family of the petitioner with the consent of the other parent in substantial deviation from the parenting plan;
(c) The child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child; or
(d) The court has found the nonmoving parent in contempt of court at least twice within three years because the parent failed to comply with the residential time provisions in the court-ordered parenting plan, or the parent has been convicted of custodial interference in the first or second degree under RCW 9A.40.060 or 9A.40.070.

RCW 26.09.260(2).

6

(2003)). "[T]o overcome the presumption against modification, the moving party must set forth facts and provide supporting evidence—not self-serving or conclusory statements—to establish adequate cause to schedule a hearing on the petition to modify." MacLaren, 8 Wn. App. 2d at 774. Then, "[t]he trial court considers and weighs the facts alleged by the parties in the affidavits, the evidence, and other factors on a case-by-case basis to determine whether the moving party has established adequate cause to hold a hearing on whether to modify the parenting plan." Id.

We review a trial court's adequate cause determination for abuse of discretion. Jannot, 149 Wn.2d at 128. "A court abuses its discretion if the decision is manifestly unreasonable, based on untenable grounds because the factual findings are unsupported by the record, or based on an incorrect standard, or the facts do not meet the requirements of the correct standards." MacLaren, 8 Wn. App. 2d at 774 (citing In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)). "[T]he procedures and criteria set forth in RCW 26.09.260 limit the superior court's range of discretion." In re Marriage of Hoseth, 115 Wn. App. 563, 569, 63 P.3d 164 (2003). Therefore, the superior court abuses its discretion if it fails to base its modification ruling on the statutory criteria. Id

A. 2019 Finding of Abusive Use of Conflict

As an initial matter, contrary to Goodman's contention, the trial court did not apply an improper legal standard by referencing the 2019 .191 finding that she engaged in abusive use of conflict in its oral ruling. Goodman argues that the court improperly conflated the 2019 abusive use of conflict finding with the standard for improper use of the legal system under the Abusive Litigation Act (ALA), chapter 26.51 RCW. She

7

correctly notes that former RCW 26.09.191(3)(e) specifies that "abusive litigation shall not constitute a basis for a finding" of abusive use of conflict, whereas the ALA creates a rebuttable presumption of abusive use of litigation if there is evidence that the same parties have litigated "[t]he same or substantially similar issues" within the past five years, citing RCW 26.51.050(1)-(4). Goodman then contends because the court "invoked" the .191 finding of abusive use of conflict from 2019, it therefore "appl[ied] an erroneous rebuttable presumption against the weight of her evidence." This argument is unavailing.

In explaining the precise issue raised by Goodman's motion in the present case, the court described the parenting plan that was the result of the prior modification trial:

> [T]he issue before me [i]s whether there's adequate cause for the petition to modify the parenting plan to move forward. What is being requested specifically is a change to the decision-making provision. The current parenting plan, because of the .191 finding by the trial court, has sole decision making with the father. And the mother is asking that it change to having sole decision making for her.

The trial court noted it could not "ignore that the trial court here did make a finding of abusive use of conflict . . . [and] at least some of the issues that were before that court and that lead to that finding appeared to be ongoing, which is a concern." Nevertheless, the court concluded that "the bottom line is that the Court doesn't find a substantial change in circumstances," and changing the decision-making provision would not reduce conflict or be in the best interest of the child.

Nothing in the record indicated that the court was incorporating an improper standard, as the core of its analysis did not reference Goodman's abusive use of conflict. Moreover, the court relied on its analysis of the record before it to arrive at its conclusion, as discussed in further detail below.

Goodman also points to the court's comment that it was "notable . . . that many of the allegations—not all, but many of the allegations . . . were about things that had already been litigated, or they were essentially sort of a continuation or repetition of the same themes or same type of dispute," such as A.P.'s autism diagnosis, his alleged allergies to common ingredients in vaccines, and numerous other health problems.[4] Rather than applying an improper presumption under the ALA, however, the court's comment related to the analysis required for a determination of adequate cause under RCW 26.09.260(10). Specifically, whether there was a substantial change in circumstances since the prior modification trial, at which some of the same issues had been litigated, as the court noted.[5]

We conclude the court did not apply a heightened standard when it discussed repeated arguments and referenced the prior .191 finding. The court's written order and the incorporated oral ruling set out and applied the correct standard under RCW 26.09.260(1) and (10).

---

[4] For example, Goodman insists that Parsons permits vaccines to be administered to A.P. despite known allergies. In the 2019 final order, the court specifically identified this issue. ("For example, the father believes that the child should be vaccinated and his healthcare providers agree; the mother believes he is allergic to vaccines even though there is scant evidence of this."); ("The mother reports that the child has numerous health problems including gastrointestinal issues, sleep problems, vaccination allergies, dairy allergies, and seasonal allergies. The father reports that the child does not have these conditions. The court was presented with little to no medical evidence that the child has these problems.").

[5] Goodman also argues that "RCW 26.09.260(10) does not require parents to address prior RCW 26.09.191 findings for limitations as a requirement for adequate cause for 'minor' parenting plan changes," in contrast to RCW 26.09.260(7), which requires a petitioner seeking to modify residential time that is limited under RCW 26.09.191(2) or (3) to demonstrate a substantial change in circumstances "specifically related to the basis for the limitation." But this argument ignores that there must still be a change in circumstances from the prior parenting plan provision that is being challenged, which here is the decision-making provision. And the court granted sole decision-making to Parsons because of the .191 finding against Goodman.

B. Adequate Cause

Goodman also challenges the trial court's conclusion that there was not adequate cause to permit a full hearing to modify the parenting plan's decision-making provision. Goodman relies heavily on MacLaren, in which this court determined a trial court abused its discretion when it held that affidavits and evidence "did not establish adequate cause to schedule a hearing on the petition to modify the parenting plan." 8 Wn. App. 2d at 753.

In MacLaren, the father sought to modify the parenting plan for his two children under RCW 29.09.260(1) and (2)(c). Id. at 754. This court found the trial court abused its discretion when it denied the motion, as the "uncontroverted record" established specific facts and evidence that there was a substantial change in circumstances. Id. at 776. It reasoned that the record did not support the trial court finding that " 'any learning disabilities or shortcomings are being directly addressed by the school with the [individual education plan] IEP and all people involved.' " Id. Rather, it found the record clearly established the child was diagnosed with autism and that the difficulties he was experiencing stemmed from this experience, and the mother continued to disagree with the diagnosis and refused to engage in autism-related treatment for him. Id. at 776-77. Similarly, it found records that established the child was diagnosed with suicidal ideation and was not receiving recommended support, proving under RCW 26.06.260(2)(c) that the present environment was detrimental to the child's "physical, mental, or emotional health." Id. at 777.

This case is distinguishable from MacLaren. First, significantly, Goodman seeks modification under a different subsection of the statute. In MacLaren, the parent sought

modification under RCW 26.09.260(2)(c), which allows a court to modify the residential schedule if "[t]he child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child." By contrast, the petition in this case sought modification pursuant to RCW 26.09.260(10), which applies to modifications of nonresidential provisions of the parenting plan. Under subsection (10), the court must determine whether there is a substantial change of circumstances as to either parent or A.P. and whether the adjustment is in the best interest of the child—specifically, relating to the circumstances that supported granting Parsons sole decision-making at the prior modification trial.

Moreover, as discussed below, the record supports the trial court's decision that Goodman did not establish adequate cause for a modification hearing. The court did not abuse its discretion in determining Goodman did not establish a substantial change in circumstances that warranted modifying the decision-making provision, or that a modification would be in A.P.'s best interest.

### 1. Escalating Mental Health Issues

Goodman asserted that A.P. has developed suicidal ideation, self-harming, disruptive behaviors, and physical aggression toward Goodman, and that Parsons either diminished these behaviors or did not appropriately respond to them. Thus, she argues, A.P.'s escalating mental health issues warrant a change in the parenting plan.

First, around September 2022, Goodman emailed A.P.'s school counselor concerning A.P.'s comments regarding suicidal ideation, negative self-talk, and physical aggression directed at her. The school counselor responded immediately, sharing

11

resources and advice. At this time, Parsons shared he had never heard A.P. "say anything or act in any way associated with self-injury . . . [he hadn't] witnessed any behavior or actions that would lead [him] to believe [A.P.] is in need of special counseling, mental, or physical health actions." Goodman also highlights notes from a pediatric visit in October 2022 where it was noted that A.P. had thoughts of self-harm and counseling was advised, but "dad thinks not needed, has safety plan through school."

In October 2022, the school counselor reported that when A.P. was coming back from recess, he had requested other students "step on his . . . crotch" because "he was feeling so upset he wanted to die," and at least one student had done so. A.P. also stated during reading class that he wanted to kill himself. When the school counselor spoke to A.P. the next day, he stated he was "not feeling like he wants to die or kill himself" but had just felt "really upset yesterday and earlier today." The counselor discussed her continued work with A.P. following the incidents.[6] In response, Parsons explained this behavior was a form of protest by A.P. because Parsons and his wife were "requiring him to do his homework and participate in school direction before he can have access to his tablet again." He noted that while A.P. was "becoming quite a good manipulator in protest," he hadn't personally witnessed any behaviors that make him believe A.P. was genuinely interested in hurting himself or others. Parsons concluded, "[r]egardless, these behaviors in school are not appropriate, and I appreciate

---

[6] In a confidential interview with A.P. during an emergency room visit relating to alleged chest pains in October 2022, he shared he felt safe at home with his mother. He shared he did "not feel safe at his father's home because his stepmother is mean to him." He also denied ever being physically harmed by his stepmother or father. The report went on to state "[A.P.] feels occasional thoughts of wanting to hurt himself or wishing he was not alive, mostly while at his father's house. Patient currently denies [suicidal ideation]. Patient states that all he has done to harm himself the past is hitting, denies cutting, ingestions, or other forms of self-harm."

you reinforcing that." Parsons concluded the email by asking the counselor to share if they had a different point of view or additional recommendations.

In March 2023, the school performed a functional behavior assessment (FBA) and made a series of recommendations involving a variety of strategies to assist A.P. Some baseline data revealed A.P. exhibited "physical aggression," "threats of self-harm," "threats to others," and "risk-taking behavior." Parsons and Goodman agreed to proceed with the FBA and get the school's recommendation on how to support A.P.

In April 2023, Goodman shared that A.P. had begun making rude and hateful comments toward her. When discussing the issue,[7] Parsons stated he did not know what would prompt this behavior and agreed it was inappropriate. Another set of emails with the school on May 31, 2023, indicated that A.P. "voiced feelings of self-harm, a dislike for school, and a sense of loneliness, saying things like, 'I want to be invisible,' 'I want to disappear,' and 'I want to kill myself.' " The school introduced a safety plan to be implemented for the final weeks of school.[8] In response to a question from Goodman, the school also confirmed that safety plans in place during the fall and winter of 2022 were still in effect.

The next incident occurred in February 2024, when A.P. squeezed another student "really hard" and the student "was on the floor crying" by the time a teacher arrived. Goodman also reported she noticed an increase in "pick marks" on A.P.'s body around May 2024. A.P. shared with Goodman that he sometimes did it "to feel the hurt."

---

[7] Following the 2019 trial, the court ordered both parties to use a third party application to communicate with each other concerning parenting decisions, "except in emergencies."

[8] During one of these behavioral episodes, A.P. was unable to return to class. Parsons was then called. He and A.P. "engaged in a heart-to-heart conversation," where "it was assessed that [A.P.'s] declaration of self-harm was not a serious intention.

Parsons provided a message exchange from the same time period, February 2024, where he attempted to discuss "autism oriented therapies" after Goodman raised the issue, but his final message remained unviewed as of July 25, 2024.

Goodman attempts to draw parallels between Parsons's alleged dismissal or diminishment of A.P.'s behavior and the parent's failure to respond appropriately to worsening mental health issues in MacLaren. For example, in MacLaren, the father reported the child had been feeling suicidal and that he had been sharing those thoughts with his mother for the past six months, which the mother later verified. 8 Wn. App. 2d at 760. Hospital records indicated the child was diagnosed with suicidal ideation and discharged "with a safety plan and instructions to obtain weekly mental health therapy and 'follow up with patient as soon as possible.' " Id. at 761. The mother denied seeing the " 'level of symptomology' " the father described or any worsening of behaviors, but she emphasized that she "never took [her child's] expressions lightly." Id. at 763, 765-66. However, while the mother stated the issues were addressed in counseling, separate records reflected the therapist discontinued services due to the style of therapy no longer addressing the child's needs. Id. at 766.

But here, unlike the parent in MacLaren, who was continually dismissive of the child's developing mental health crisis, Parsons did not dispute that A.P. "has been reported to make inappropriate comments . . . in certain instances." Furthermore, the record demonstrates Parsons accepted and acted on recommendations from the school concerning A.P.'s educational and mental health needs. Indeed, when the issues began in fall 2022, the school and parents developed and implemented a safety plan that was maintained through at least the spring of 2023. Parsons also encouraged A.P.'s

participation in supportive "peer-to-peer" activities such as "parkour, swimming, Rubik's [cube] competitions, and neighborhood activities with" neighborhood children.

Moreover, while Goodman may not have agreed with Parsons's decisions, the record does not demonstrate that A.P.'s emerging mental health issues are connected to Parsons's decision-making, as would be necessary to support a change to the parenting plan provision that originally granted Parsons sole decision-making. Therefore, the court did not abuse its discretion in determining there was not adequate cause for a hearing based on Parsons's decision-making relating to escalating health issues.

2. Educational Needs

To demonstrate A.P.'s educational decline, Goodman submitted a comprehensive educational evaluation dated March 10, 2023. Previously, A.P. had been receiving classroom accommodations through a "504 Plan,"[9] which had been in place since fall 2020. On December 16, 2022, the school "Guidance Team" met with the parents to discuss A.P.'s strengths, weaknesses, and areas of concern. The "Guidance Team" determined an initial evaluation was warranted, "with parents in agreement." The evaluation reflected, among many things, below average performances associated with reading and writing, and eventually determined math should be added as an area of assessment as well. A school test score report from spring 2024 further indicated that A.P. continued to struggle with reading overall. However, a "Goal Progress Report" from June 2024 indicated that A.P. was anticipated to meet six out of seven goals related to

---

[9] "A 504 plan is a type of special education plan, which is applied to students with temporary or permanent disabilities." Nieshe v. Concrete Sch. Dist., 129 Wn. App. 632, 636, 127 P.3d 713 (2005).

the topics of "writing," "reading," "behavior," and "social and emotional," as indicated by his special education teacher.[10]

Separately, Goodman presented a psychological assessment performed in August 2024 that determined A.P. met the diagnostic criteria for "Specific Learning Disorder with impairment in reading (Dyslexia)"[11] and "Specific Learning Disorder with impairment in written expression."

Regarding educational needs, the court focused on the most recent "Goal Progress Report" from June 2024. The court enunciated its reasoning:

> And sort of the takeaway for the Court is that he is making at least some progress on most of the goals. And again, it's clear that he does have some specialized educational needs. It's clear that he has—that certain things are very difficult for him compared to, perhaps, what is average. But it's also clear that he has some strengths. And it's clear from the notes that, again, he is making progress. And he's getting assistance from the school to address those areas that he's behind in.
>
> The allegation that essentially there's been inconsistent follow-through or involvement or cooperation with the school and the IEP, I did not find support for that in the record. But, frankly, even if I did, the fact that at least recently and currently there is engagement and involvement, that would, in terms of adequate cause, likely—the prior lack of involvement likely would not be sufficient for adequate cause.
>
> Because on adequate cause, we're looking at what's going on now . . .
>
> I want to be clear, I'm not saying that I am finding that previously there wasn't involvement. But I just wanted to be clear that that was part of what was alleged, was that there's been inconsistency. And that, in and of itself, would likely not be a basis for adequate cause even if the Court did make that finding.

---

[10] A.P. was not anticipated to meet one of the two "written expression" goals.

[11] The school evaluation from the prior year discussed dyslexia, stating

> The school team stated that [they] [were] not able to diagnose [A.P.] with Dyslexia; however, the curriculum that will be used within special education to support [A.P.]'s reading skills has components that are aligned with instruction for individuals with Dyslexia. Additionally, the current special education teacher has training in instruction using phonological and orthographic processes for breaking reading down into smaller skills involving letters and sounds, and then building on these skills over time.

The court did not abuse its discretion when it reached the conclusion that there was no adequate cause to modify the parenting plan based on the decisions Parsons's made related to A.P.'s educational needs. This case is unlike MacLaren, where the autism diagnosis emerged years after the parenting plan was finalized. Id. at 753-54. In MacLaren, the father submitted school records that indicated one of the children's "symptoms have worsened" but the mother had consistently denied that anything was wrong and "refused" to follow school recommendations to have the child evaluated for neurodevelopment problems. Id. at 755, 756. The mother "eventually consented" to an evaluation. Id. at 756. A report diagnosed the child with autism, among other things, in 2016. Id. at 754. After, the father provided the report to the school, and special education providers attempted to expand the child's IEP, the mother objected and continued to object to alterations of the child's educational plan until the hearing. Id. at 758-59. She also proceeded to seek a series of other diagnoses to prove the child did not have autism. Id. at 759-60.

Here, A.P.'s diagnosis of autism was known to the court at the time of the 2019 trial on Parsons's petition for modification, when it entered the final parenting plan that Goodman now seeks to modify.[12] Although there was concern that his initial diagnosis was unreliable given how young he was when the test was administered, the court was aware of the parents' disagreement around how to approach the possible diagnosis and

---

[12] ("One of the biggest areas of disagreement between the parents pertains to whether the child is autistic . . . Although he was diagnosed with autism, the diagnosis appears to have been based primarily on his speech delay which has since resolved. Dr. Wieder testified credibly that an autism diagnosis of a child less than 30 months old is inherently unreliable. Dr. Weider testified credibly that although the child was diagnosed with autism, he is now meeting all targets of therapy, is not in need of special services, and is on track academically and socially.")

(emphasis omitted).

ordered a reevaluation within the next six months. Regardless, unlike the parent in MacLaren who denied the autism diagnosis despite professional testimony that corroborated this diagnosis, the denial resulted in the child facing additional difficulties. Id. at 776, 768. Here, Parsons did not deny the diagnosis or reject the school's recommendations for educational support. For example, while Goodman describes the initial removal of A.P.'s IEP for social and emotional support in 2020 as a decision Parsons made unilaterally, "the [school] team decided unanimously at the evaluation feedback meeting to exit [A.P.] from special education services." Additionally, a 504 Plan was in place between 2020 and 2023 to separately provide support, and Parsons approved of additional support during this time as issues emerged, such as approving additional reading support. When reevaluation was recommended in 2023 given A.P.'s developing struggles, both parents agreed to the process, and Parsons, who had sole decision-making authority, specifically consented to the reevaluation. An IEP was reinstated by March 2024, and a progress evaluation from June 2024 indicated A.P. would meet a majority of his goals.

### 3. Unmet Medical Needs

Goodman also argued that A.P. had not been to the dentist in six years. In response, Parsons submitted documentation that acknowledged delays in dental care, but showed that A.P. received a comprehensive dental exam on July 18, 2024. The appointment notes reflected no cavities or major concerns. Goodman also argued that A.P. had received a recommendation to follow up with vision specialists after a 2017 vision exam and there was a lack of follow-up on Parsons part.

When considering the gap in dental care, the trial court applied similar reasoning as it did with educational issues, concluding the record did not indicate "that there were any issues or that the child experienced any type of detriment as a result of not going to the dentist for several years" and that they were "on track again." As for the concerns about A.P.'s vision, exchanges between Parsons and Goodman as recently as 2023 indicated that A.P. had visited an eye doctor and no tests suggested he had any vision problems. A school evaluation from 2023 also indicated he passed vision screening. Goodman raised a plethora of other examples that allege neglect by Parsons, which the record does not bear out.[13] To the extent the parties presented conflicting evidence, the factfinder has discretion to weigh the evidence, and the reviewing court does not reweigh it. In re Marriage of Black, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017).

In sum, after considering A.P.'s emotional, educational, and medical well-being, the trial court did not abuse its discretion by holding there was not adequate cause to hold a hearing on the petition to modify the parenting plan. The record did not show that the difficulties A.P. experiences resulted from Parsons's decision-making or that Parsons failed to take adequate steps to address the difficulties as they emerged. Accordingly, we affirm the trial court's order denying the motion to show adequate cause.

---

[13] In addition to these medical concerns, Goodman discusses issues with sleep apnea and allergies. However, Parsons stated in his declaration that none of these issues have been noted in A.P.'s wellness checks. Goodman asserts that Flonase, one of the prescribed medications to treat A.P.'s chronic nasal congestion was only used in her home. But during an exchange between the two, Parsons contended that he did agree "to a test of using Flonase daily for 4 weeks" and "did [it] without fail." Although he noted that they saw "no benefit" from using Flonase consistently. Similarly, Goodman alleged "an untreated strep infection required urgent care after [Parsons] failed to address it during his residential time." However, the start of the exchange began with Parsons alerting Goodman that A.P. was beginning to fall ill and the steps he had taken to address the emergent issue—including administering medication and tracking his fever.

III. <u>Prior Restraint of First Amendment Rights</u>

During the hearing on adequate cause, the court heard argument on attorney fees and requested the parties speak to "whether there is a basis for the Court to make a finding of bad faith." The court stated it was a difficult decision, but it ultimately declined to find bad faith. It was persuaded by findings in the 2019 parenting plan which recognized "[t]he mother is not being deceptive when she reports her child's symptoms to medical providers. She believes the symptoms exist." However, the court also explained why not finding bad faith was a difficult decision:

> I'm reluctant, or hesitant, in not making that finding here. And I hope that the Respondent, sort of, *can consider herself on notice that this is an issue that will be increasingly hard to give her the benefit of the doubt on if the same pattern repeats again in the future*.

> And it's certainly entirely possible that things would get to the point where the Court would not find it credible that she doesn't actually understand that the case is not supported by evidence.

> So I hope that the Court's ruling on this issue is not seen as an open invitation to continue the litigation in this case . . .

(Emphasis added.)

Goodman argues that "the trial court's ruling putting [her] 'on notice' [of the issue of bad faith] constitutes an unconstitutional restraint on her first amendment rights." Parsons disagrees, arguing that the comment from the court does not limit, restrict, or stop Goodman from seeking modification to the parenting plan or any other legal option.[14] We agree with Parsons.

---

[14] Goodman also argues that because the trial court improperly applied the prior .191 finding of abusive use of conflict to scrutinize her petition, the court also infringed on her right to petition the courts. Because we conclude that the trial court did not improperly consider her abusive use of conflict when it denied her petition, we decline to address the issue.

"The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.' " Alexander v. United States, 509 U.S. 544, 550 (1993) (quoting M. Nimmer, Nimmer on Freedom of Speech § 4.03, at 4-14 (1984)) (emphasis added), quoted in In re Marriage of Suggs, 152 Wn.2d 74, 81, 93 P.3d 161 (2004). "Prior restraints carry a heavy presumption of unconstitutionality." Suggs, 152 Wn.2d at 81 (citing Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963)).

In Suggs, a trial court issued a post-dissolution antiharassment order that "permanently restrained Suggs from 'knowingly and willfully making invalid and unsubstantiated allegations or complaints to third parties which are designed for the purpose of annoying, harassing, vexing, or otherwise harming Andrew O. Hamilton and for no lawful purpose.' " Id. at 78-79. Our supreme court reversed, holding that "[t]he order's 'invalid and unsubstantiated' language is particularly problematic in this context because what may appear valid and substantiated to Suggs may ultimately be found invalid and unsubstantiated by a court." Id. at 84. It further reasoned that because Suggs would be fearful of "what allegations may or may not ultimately be found invalid and unsubstantiated, Suggs may be hesitant to assert any allegations, including those she deems truthful." Id.

Here, the challenged statement—that Goodman should be "on notice that this is an issue that will be increasingly hard to give []the benefit of the doubt on if the same pattern repeats again in the future"—is not an administrative or judicial order forbidding certain communications in advance of them occurring. Unlike the order in Suggs, the

trial court's comment does not restrict Goodman from exercising any legal rights. Thus, Goodman's prior restraint claim fails.

IV. Attorney Fees

Parsons requests attorney fees on appeal based on Goodman's alleged intransigence, as well as costs pursuant to RAP 14.4. Goodman argues that "he fails to identify anywhere in the record to substantiate his claim" that she was intransigent.

"Intransigence is a basis for awarding fees on appeal, separate from RCW 26.09.140 (financial need) or RAP 18.9 (frivolous appeals)." Mattson v. Mattson, 95 Wn. App. 592, 605, 976 P.2d 157 (1999). "A court may award one party attorney fees based on the other party's intransigence if the other party engages in foot-dragging and obstruction." In re Marriage of Pennamen, 135 Wn. App. 790, 807, 146 P.3d 466 (2006). "The party requesting fees for intransigence must show the other party acted in a way that made trial more difficult and increased legal costs, like repeatedly filing unnecessary motions or forcing court hearings for matters that should have been handled without litigation." Id.

Here, Parsons primarily relies on conclusory statements that Goodman has been intransigent. Although he notes that the failed motion for adequate cause and motion for reconsideration, as well as this appeal, have increased legal costs, he fails to identify instances of intransigence as opposed to the normal cost of litigation. Instead, he argues that "Goodman "pursued allegations not well grounded in fact [that] directly increased [his] costs." He claims the First Amendment arguments are "false and exaggerated claims" in violation of CR 11. But he does not identify conduct that demonstrates intransigence, such as repeatedly filing unnecessary motions, forcing the

22

court to hear matters that should have been handled without litigation, or otherwise prolonging proceedings through foot-dragging and obstructionist behavior. Therefore, we decline to award fees to Parsons, as he fails to show particularized acts of intransigence.

## CONCLUSION

We affirm the trial court's denial of the motion to show adequate cause and deny Parsons's request for fees on appeal.

_____
Chung, J.

WE CONCUR:

_____        _____
Coburn, J.                                              Mann, J.